<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| YASIN VILLAFANA,<br><br>        Plaintiff,<br><br>        v.<br><br>STATE OF NEW JERSEY, *et al.*,<br><br>        Defendants. | No. 25cv18942 (EP) (CF)<br><br>**OPINION** |

**PADIN, District Judge.**

*Pro se* Plaintiff Yasin Villafana, a convicted state prisoner confined at Northern State Prison ("NSP") in Newark, New Jersey, has filed a complaint bringing various civil rights claims under 42 U.S.C. § 1983, N.J. Stat. Ann. §§ 2C:30-6, 2C:48B, 2C:30-7, N.J. Admin. Code § 10A:1-5, and 18 U.S.C. §§ 241, 242 against Defendants the State of New Jersey, the New Jersey Department of Corrections ("NJDOC"), NSP, NSP's Administrators (the "John Doe Administrator Defendants"), Essex County and its Council, the City of Newark, unidentified Special Operations Group officers ("John Doe SOG Defendants"), and NSP correctional officers RahQuan J. Everett ("Everett"), Orville O. Dawson ("Dawson"), Tiffany C. Franklin ("Franklin"), and Sergeant Eduardo Pitre ("Pitre"). D.E. 1 ("Complaint" or "Compl.") at 1-9. Plaintiff also seeks to proceed in forma pauperis ("IFP"). D.E. 1-2 ("IFP Application").

Because Plaintiff demonstrates financial need, the Court will **GRANT** Plaintiff's IFP Application. After screening the Complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, the Court will also allow Plaintiff to **PROCEED** with the following claims: (1) his Eighth Amendment conditions-of-confinement claim based on exposure to unsanitary conditions (including rodent and pest infestations), and chronic secondhand smoke or aerosolized fumes from K-2 and fentanyl throughout NSP against the John Doe Administrator Defendants; (2) his Eighth

Amendment conditions-of-confinement claim based on his cellmate LB's active K-2 and fentanyl use against Officer Everett and Sergeant Pitre; (3) his Fourth Amendment unreasonable strip search claim arising from the November 15, 2025 SOG raid against the John Doe SOG Defendants; and (4) his First Amendment retaliation claims against Officers Dawson, Franklin, and Everett. However, the Court will **DISMISS** Plaintiff's remaining claims, for the reasons set forth herein.

## I.    BACKGROUND

The Complaint largely centers on the conditions of confinement at NSP, including mold, infestations of roaches, mice, and rats, the allegedly pervasive drug activity, and the secondhand smoke or aerosolized fumes from illicit drug use. Compl. at 20-22. Plaintiff alleges that showers, toilets, pipes, and common areas are unsanitary, cleaning supplies and toilet paper are inadequate, and inmates are housed with cellmates who are mentally ill or actively using drugs. *Id.* Plaintiff also contends that the food at NSP is unhealthy and heavily processed, that rehabilitative programming is limited and ineffective, and that institutional systems governing inmate work, pay, and supplies are deficient. *Id.* Plaintiff asserts that the conditions and operation of the facility reflect a broader failure to maintain a safe, rehabilitative environment. *Id.* He also alleges that the unlawful conditions exist because the inmate population is disproportionately Black. *Id.*

Construing the Complaint liberally, Plaintiff also brings an unreasonable search claim arising under the Fourth and Eighth Amendments against the John Doe SOG Defendants involved in strip searching Plaintiff on November 15, 2025, as well as the John Doe Administrator Defendants allegedly responsible for his conditions of confinement. *Id.* at 12-17.

Additionally, Plaintiff alleges that a series of unlawful searches and retaliatory actions were taken against him for filing complaints in July and August 2025. During this period, Officer Dawson allegedly reported to work on Plaintiff's housing unit, Unit A1W (NSP's honor unit), while intoxicated, and engaged in a pattern of targeted searches and harassment directed at Plaintiff. *Id.* at 18-19. According to Plaintiff, Dawson strip-searched Plaintiff on July 11, 2025,

2

and again on July 22, 2025, without any justification to do so. *Id.* at 18. On July 25, 2025, Dawson—allegedly while visibly intoxicated—searched Plaintiff's cell, discarded his underclothes, sneakers, and stamps, falsely accused Plaintiff of refusing medical treatment, denied Plaintiff recreation, and threatened to mace Plaintiff after Plaintiff stated that Dawson had identified the wrong person. *Id.* Plaintiff complained to NSP's Administration (*i.e.*, the John Doe Administrator Defendants) about these incidents. *Id.*

Officer Franklin filled in for Dawson in Plaintiff's unit during the first week of August 2025, and during that time, conducted between six and eight searches of Plaintiff's cell. *Id.* at 18-19. Officer Franklin told Plaintiff that she knew he was getting drugs in the mail, which he denied; Plaintiff also reported Franklin's conduct to the NSP Administrator Defendants. *Id.* at 19. On August 6, 2025, Officer Dawson returned to work and questioned why Plaintiff had filed a complaint against Officer Franklin. *Id.* Officer Dawson then refused to allow Plaintiff to go outside for recreation. *Id.* The next day, Plaintiff was moved to the alleged worst unit in the prison—F1E—allegedly in retaliation by Officers Franklin and Dawson given Plaintiff's complaints about their conduct. *Id.* at 10, 11, 19.

In late August or early September 2025, an inmate died in Unit F1E, which was Plaintiff's unit at the time. *Id.* at 22. Prison staff left the body covered by a sheet, and Plaintiff observed mice running across the body for hours while it was left in the cell across from him. *Id.* at 22. Witnessing these events caused Plaintiff significant emotional distress. *Id.*

Plaintiff further alleges that, while housed in Unit F1E, Officer Everett assigned him to a cell with "LB," who was known by Everett and other prison staff to be actively using K-2 and fentanyl. *Id.* at 16-17. Plaintiff informed Officer Everett's supervisor, Sergeant Pitre, about the situation, but Pitre told Plaintiff there was nothing he could do. *Id.* at 4, 12-14.

On November 15, 2025, at approximately 5:00 AM, officers in the SOG conducted a surprise raid of Unit F1E, during which officers strip-searched Plaintiff and other inmates with

3

their body cameras activated.  *Id.* at 15.  The SOG did not initially disclose that the body cameras were recording video, in violation of N.J. Admin. Code § 10A:3-5.7.  *Id.*  Plaintiff later requested that the John Doe Administrator Defendants preserve the video footage for purposes of litigation.  *Id.*

On November 17, 2025, Sergeant Pinto observed suspected drug residue on LB's bed in Plaintiff's cell.  *Id.* at 17.  This precipitated Plaintiff's removal from the cell and subsequent drug testing.  *Id.*  Plaintiff's drug test was negative, and he returned to the unit, but LB did not return.  *Id.*  Within a day or two, a new inmate, who also used K-2 and fentanyl, was assigned to Plaintiff's cell.  *Id.* at 17, 19.

On December 1, 2025, Plaintiff and others were temporarily moved from Unit F1E to Unit D3E.  *Id.* at 17.  On December 8, 2025, the SOG conducted a search of Unit D3E with K-9 units, during which officers reportedly detected the odor of K-2 and fentanyl in the air.  *Id.*

## II.    LEGAL STANDARD

28 U.S.C. § 1915(a) requires a prisoner seeking to proceed IFP to submit an affidavit of poverty and a certified copy of the prisoner's institutional account statement for the six-month period immediately preceding the filing of the complaint.  28 U.S.C. § 1915(a)(2).  When a prisoner is unable to prepay the filing fee, the Court must assess an initial partial filing fee of twenty percent of the greater of the average monthly deposits to the prisoner's account or the average monthly balance in the prisoner's account for the six-month period immediately preceding the filing of the complaint.  28 U.S.C. § 1915(b)(1).[1]

---

[1] Plaintiff has submitted a completed affidavit of poverty indicating that he receives approximately $35.00 per month from his institution and has no other assets, savings, or income.  IFP Application at 2.  Although the Account Certification section of the IFP Application does not bear the signature of a prison official, the affidavit is otherwise complete, the account balance information provided is consistent with indigency, and there is no indication in the record that Plaintiff has funds sufficient to prepay the filing fee.  Under these circumstances, the Court exercises its discretion to **GRANT** Plaintiff's IFP Application and will assess the partial filing fee in accordance with 28 U.S.C. § 1915(b).

The PLRA requires district courts to screen complaints filed by prisoners seeking IFP status or redress against a governmental entity, officer, or employee before docketing or as soon as practicable. 28 U.S.C. §§ 1915(e)(2)(B), 1915A. The Court must *sua sponte* dismiss any claim that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary damages from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b).

The standard for dismissal upon screening is the same as that under Federal Rule of Civil Procedure 12(b)(6). *Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999). Therefore, to survive dismissal at the screening stage, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Mere conclusory allegations are insufficient. *Id.*

Because Plaintiff is proceeding *pro se*, the Court must construe the Complaint liberally and hold it to less stringent standards than formal pleadings drafted by lawyers. *Erickson v. Pardus*, 551 U.S. 89 (2007). Nevertheless, even a *pro se* complaint must allege sufficient facts to state a plausible claim. *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013).

## III.    DISCUSSION

A plaintiff states a claim under 42 U.S.C. § 1983 by alleging "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). The Court construes the Complaint to allege violations of Plaintiff's rights under the First, Fourth, Eighth, and Fourteenth Amendments to the Constitution. "With only 'a handful' of exceptions" not present here, "the Fourteenth Amendment's Due Process Clause incorporates

5

the protections contained in the Bill of Rights, rendering them applicable to the States." *Timbs v. Indiana*, 586 U.S. 146, 150 (2019) (quoting *McDonald* v. *Chicago*, 561 U.S. 742, 764-65 (2010)).

"Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021). Here, the State of New Jersey, and its agency, the NJDOC, are immune from suit for monetary damages in federal court. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) (holding that the Eleventh Amendment bars suits against states and state entities); *Laskaris v. Thornburgh*, 661 F.2d 23 (3d Cir. 1981) (same). Additionally, a prison like the NSP is not a "person" capable of being sued within the meaning of § 1983. *Lenhart v. Pennsylvania*, 528 F. App'x 111, 114 (3d Cir. 2013). Therefore, Plaintiff's § 1983 claims against the State of New Jersey, the NJDOC, and NSP are **DISMISSED *with prejudice***. Likewise, Plaintiff's § 1983 claims for damages against Defendants in their official capacities are **DISMISSED *with prejudice*** under the Eleventh Amendment. *See Kentucky v. Graham*, 473 U.S. 159 (1985) (holding official-capacity damages claims are treated as claims against the state and are barred); *see also Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249 (3d Cir. 2010) (affirming dismissal of § 1983 claims for damages against state officials in their official capacities). Accordingly, the Court proceeds to consider whether Plaintiff has stated a claim against any individual Defendants acting in their personal capacities.

A. **Eighth Amendment Conditions of Confinement Claims**

The Eighth Amendment prohibits the imposition of cruel and unusual punishment and imposes on prison officials a duty to "provide humane conditions of confinement" and to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). A conditions-of-confinement claim requires a plaintiff to satisfy two elements: (1) an objective prong requiring a showing that the deprivation was sufficiently serious; and (2) a subjective prong requiring a

6

showing that prison officials acted with deliberate indifference—that is, with subjective knowledge of a substantial risk of serious harm and disregard of that risk. *Id.* at 834, 837. "Some conditions of confinement may establish an Eighth Amendment violation in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise[.]" *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (citation modified).

> 1.    *Conditions that pose a substantial risk to Plaintiff's health*

Where a prisoner alleges that he was involuntarily exposed to a known environmental health hazard, the applicable legal framework comes from *Helling v. McKinney*, which makes clear that deliberate indifference to a serious future health risk—including exposure to secondhand smoke—can constitute cruel and unusual punishment even absent a present physical injury. 509 U.S. 25, 33-35 (1993). The *Helling* framework is distinct from the "unfettered access" line of cases applying *Zakora v. Chrisman*, 44 F.4th 452 (6th Cir. 2022), and *Caraway v. CoreCivic of Tenn., LLC*, 98 F.4th 679 (6th Cir. 2024), which address Eighth Amendment liability arising from prison officials' failure to interdict drug supplies, where the constitutional harm is the resulting overdose risk to inmates who consume those drugs. *See Trussell v. Monmouth Cnty.*, No. 24-151, 2025 WL 914923, at *5–7 (D.N.J. Mar. 26, 2025) (applying *Zakora* and *Caraway* in case involving estate of prisoner who died of drug overdose). Plaintiff does not allege that he ingested or was at risk of ingesting K-2 or fentanyl; rather, he alleges that he was chronically exposed to secondhand smoke or aerosolized fumes from active drug use by cellmates assigned to his cell and by inmates throughout his housing unit—a theory of environmental harm cognizable under *Helling*. The Court therefore evaluates this claim under the *Helling* framework, while drawing on the factual analysis developed in *Trussell* and its predecessors where instructive.

Under *Helling*, the objective prong of the deliberate indifference inquiry requires the prisoner to show:  (1) that the risk of harm from the exposure was sufficiently serious and (2) that society would not regard such exposure as acceptable.  509 U.S. at 35-36.

As an initial matter, the Court notes that the specific substances at issue here—K-2 and fentanyl—are among the most dangerous substances in the correctional environment.  Fentanyl is potentially lethal in even minuscule doses; its dangers are "magnified when introduced to a controlled environment like a prison."  *Trussell*, 2025 WL 914923, at \*6 (quoting *Zakora*, 44 F.4th at 470).  K-2, a synthetic cannabinoid, similarly poses extreme risks of severe adverse reactions in correctional settings.  *See Chapolini v. Carney*, No. 24-1136, 2025 WL 2166014, at \*4-5 (E.D. Pa. July 30, 2025) (noting that fentanyl and synthetic cannabinoids like K-2 are extremely dangerous in correctional settings and pose heightened risks of overdose and severe adverse reactions).  The inherent toxicity of these substances informs the Court's assessment of the objective prong in the secondhand-smoke context:  involuntary exposure to smoke or aerosol from fentanyl and K-2 use poses health risks of a kind that society would not regard as tolerable.  *See Helling*, 509 U.S. at 36; *Atkinson v. Taylor*, 316 F.3d 257, 262 (3d Cir. 2003).  Plaintiff alleges chronic exposure to this secondhand smoke and/or aerosolized fumes in his shared cell with a known active drug user, LB, as well as pervasive exposure throughout his housing units at NSP, corroborated by multiple SOG raids that detected drug odors across units as late as December 2025.  Compl. at 16-17, 20-22.  These specific, non-conclusory allegations satisfy the objective prong at the IFP screening stage.

Next, under the subjective prong of the deliberate indifference inquiry, "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety."  *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012).  It is not sufficient that an official should have known of the risk; the defendant must actually have known.  *Id.*  However, a plaintiff may prove actual knowledge "in the usual ways, including inference from circumstantial evidence," and "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the

risk was obvious." *Farmer*, 511 U.S. at 842.  A plaintiff "may demonstrate deliberate indifference by showing that the risk of harm was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past such that the defendants must have known about the risk." *Parkell v. Danberg*, 833 F.3d 313, 335 (3d Cir. 2016) (quoting *Betts*, 621 F.3d at 259).  Because the subjective prong is a personal inquiry, the analysis applies to each defendant individually.  *See Trussell*, 2025 WL 914923, at *11 (distinguishing between supervisory officials, who may be charged with systemic knowledge, and rank-and-file officers, as to whom plaintiff must plead specific facts showing how and when each officer came to know of the risk).

As to the John Doe Administrator Defendants, Plaintiff alleges a pervasive, longstanding, and institutionally notorious drug-use environment at NSP, spanning multiple housing units over several months and corroborated by SOG raids with K-9 units detecting drug odors as late as December 2025.  Compl. at 15, 17, 20-22.  He further alleges that NSP's leadership was directly on notice of these conditions through his repeated complaints.  *Id.* at 18-19.  The well-documented and pervasive nature of the drug problem, combined with the purported absence of any meaningful institutional response—and the worsening of Plaintiff's housing assignment in response to his complaints rather than improvement of conditions—supports the inference that the relevant administrators knew of and disregarded the substantial risk to Plaintiff's health.  *Parkell*, 833 F.3d at 335.  Plaintiff's allegation that in late August or early September 2025, an inmate died in Unit F1E while Plaintiff was housed there, and that prison staff left the body unattended for hours as mice ran across it, further supports the subjective prong.  This disturbing allegation demonstrates that the deterioration of conditions at NSP—including pest infestations and inadequate oversight— was not merely theoretical but tangible and observed by administrators.  The failure of staff to promptly and properly address the situation supports the inference that administrators were deliberately indifferent to conditions in Unit F1E.  Compl. at 22.  Therefore, this claim may **PROCEED** against the John Doe Administrator Defendants.  However, as the case progresses,

9

Plaintiff must identify by name those administrators with contemporaneous knowledge of the conditions who failed to take reasonable measures to address them.

As to Officer Everett, the Complaint also pleads the subjective prong with particularity. Plaintiff does not merely allege that Everett worked in a facility where drug use was present, but rather pleads facts that Officer Everett made an affirmative, individualized housing decision—assigning Plaintiff to Cell 203 with LB—with actual knowledge that LB was actively using K-2 and fentanyl. Compl. at 4, 12-14. This allegation is meaningfully different from claims that have failed in cases where plaintiffs asserted in conclusory terms that officers had "knowledge" of a drug problem without explaining how or when that knowledge was acquired. *See Trussell*, 2025 WL 914923, at *11 (citing *Caraway*, 98 F.4th at 687). Here, the specific content and circumstances of Officer Everett's knowledge are embedded in the allegation itself: Officer Everett knew LB was a drug user, knew Plaintiff would be housed with LB, and made the cell assignment nonetheless. The deliberate indifference element is satisfied as to Officer Everett, and therefore, this claim may **PROCEED** against him.

Although it is a closer call with Sergeant Pitre, Plaintiff has also alleged enough at the IFP screening stage. Plaintiff alleges that Sergeant Pitre was specifically informed of the dangerous conditions—the drug-using cellmate, the ongoing K-2 and fentanyl exposure—and of Plaintiff's repeated requests for a cell change, and that Sergeant Pitre declined to act when he said that there was nothing he could do. Compl. at 4, 14. Again, Plaintiff's allegations are qualitatively different from a generalized failure-to-monitor allegation because he has alleged facts that Sergeant Pitre was personally on notice of the specific risk to Plaintiff and declined to address that risk. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (supervisor liable where he knew of and "acquiesce[d] in" violations). Accordingly, the deliberate indifference element is satisfied as to Sergeant Pitre.

10

In sum, Plaintiff's Eighth Amendment conditions-of-confinement claim based on exposure to secondhand K-2 and fentanyl smoke shall **PROCEED** against Officer Everett and Sergeant Pitre in their individual capacities, and against John Doe Administrator Defendants in their individual capacities. To the extent Plaintiff seeks prospective injunctive relief for ongoing unconstitutional conditions, that claim may **PROCEED** against John Doe Administrator Defendants in their official capacities as well. *See Ex parte Young*, 209 U.S. 123, 155-56 (1908); *MCI Telecomm. Corp. v. Bell Atl.-Pa.*, 271 F.3d 491, 506 (3d Cir. 2001) (reaffirming that *Ex parte Young* permits suits against state officials in their official capacities for prospective injunctive relief to remedy ongoing violations of federal law). No damages claims may proceed against any defendant in his or her official capacity. *See Graham*, 473 U.S. 159.

Plaintiff's allegations concerning rodent infestations, pests, and other sanitary conditions at NSP are also properly analyzed under the *Helling* framework as conditions posing a substantial risk to Plaintiff's health. The Complaint alleges mold, infestations of roaches, mice, and rats, unsanitary showers, toilets, pipes, and common areas, and inadequate cleaning supplies. Compl. at 20–22. These conditions, taken together, plausibly allege the kind of pervasive, institutionally-tolerated unsanitary environment that courts have recognized as satisfying the objective prong of a conditions-of-confinement claim. *See Atkinson v. Taylor*, 316 F.3d 257, 262–63 (3d Cir. 2003) (exposure to environmental hazards, including unsanitary conditions, can satisfy the objective prong); *see also Helling*, 509 U.S. at 33–35. As with the secondhand drug smoke claim, the John Doe Administrator Defendants' awareness of these conditions is plausibly alleged through Plaintiff's repeated complaints, the pervasive and visible nature of the infestations, and the absence of any remedial response. Accordingly, Plaintiff's Eighth Amendment conditions-of-confinement claim based on rodent and pest infestations and unsanitary conditions shall also **PROCEED** against the John Doe Administrator Defendants.

11

2.      *Conditions that pose a substantial risk to Plaintiff's safety*

To satisfy the objective prong of a safety-based conditions-of-confinement claim, a plaintiff must allege that he faced a "substantial risk of serious harm"—not merely exposure to unpleasant or difficult conditions.  *Farmer*, 511 U.S. at 834.  The risk must be one that is objectively serious, meaning a reasonable official in the defendant's position would have recognized it as posing a substantial danger.  *Id.* at 837.  General cohabitation with prisoners who use drugs or suffer from mental illness does not, without more, satisfy this standard.  To plead a cognizable safety claim, Plaintiff must allege facts showing that a specific cellmate or fellow prisoner posed a particularized threat—for example, a known history of violence, specific threats directed at Plaintiff, or prior assaults on other inmates.  *See Young v. Quinlan*, 960 F.2d 351, 361 (3d Cir. 1992) (finding an Eighth Amendment claim stated where officials placed prisoner with known violent cellmate after being warned); *see also Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997) (deliberate indifference to known risk of inmate-on-inmate violence can state an Eighth Amendment claim).

The Complaint does not allege that any drug-using or mentally ill prisoner assaulted Plaintiff, threatened Plaintiff with violence, or had a known history of attacking other inmates.  Plaintiff's generalized concern about being housed with such individuals—without allegations of a specific, identifiable threat of physical harm—is insufficient to establish the objective prong of a safety-based conditions claim.  Accordingly, this claim is **DISMISSED *without prejudice*.**[2]

3.      *Conditions that deprive Plaintiff of a nutritionally adequate diet*

The Eighth Amendment requires that prisoners receive nutritionally adequate food.  *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1980); *see also Tillery v. Owens*, 719 F. Supp. 1256, 1305

---

[2] If Plaintiff can allege specific facts establishing that a particular cellmate or prisoner posed a known and serious physical threat of which a named defendant was aware, this claim *might* survive the IFP screening stage.

12

(W.D. Pa. 1989), *aff'd*, 907 F.2d 418 (3d Cir. 1990) (diet need only be adequate to maintain health). The constitutional floor is nutritional sufficiency, not palatability or adherence to any particular dietary philosophy. Courts have consistently held that complaints about food quality, taste, preparation, or healthfulness—absent allegations that the diet was calorically or nutritionally deficient or that it caused actual harm to the plaintiff's health—do not state a cognizable Eighth Amendment claim. *See, e.g.*, *Burgin v. Nix*, 899 F.2d 733, 734-35 (8th Cir. 1990) (no Eighth Amendment violation from meals that were unpalatable); *cf. Rhodes v. Chapman*, 452 U.S. 337, 347-49 (1981) (Constitution does not mandate comfortable prisons, only constitutionally adequate ones).

Plaintiff alleges that the food served at NSP is unhealthy, ultra-processed, and bio-engineered, but he does not allege that the diet is calorically insufficient, that it lacks essential nutrients, or that he has suffered any specific adverse health consequence from it. He also does not identify any named defendant as responsible for food procurement or preparation, or allege that any identifiable official acted with deliberate indifference to a known risk to his health from the diet. Therefore, Plaintiff's diet-related Eighth Amendment claim is **DISMISSED** *without prejudice*.

### 4. *Failure to provide proper environment for rehabilitation*

The Eighth Amendment does not guarantee inmates access to rehabilitative programming, educational opportunities, or vocational training. Indeed, the Constitution "does not mandate comfortable prisons," and prison conditions that are merely restrictive or harsh do not, without more, violate the Eighth Amendment. *Rhodes*, 452 U.S. at 349. The Supreme Court has specifically noted that prisoners have no constitutional right to rehabilitative programs as such. *See Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976). Courts of appeals have uniformly agreed. *See Hoptowit v. Ray*, 682 F.2d 1237, 1254-55 (9th Cir. 1982); *Inmates of Occoquan v. Barry*, 844 F.2d 828, 836 (D.C. Cir. 1988) (rehabilitation programs are not a constitutional requirement).

Plaintiff's allegations that programming at NSP is limited and ineffective, that institutional work assignments are inadequate, and that the prison's pay and supply systems are deficient do not allege the deprivation of any constitutionally recognized entitlement.  He does not allege that the absence of programming created a specific, identifiable risk of serious physical harm of constitutional magnitude, or that any named defendant was deliberately indifferent to such a risk.  The Eighth Amendment asks whether prisoners are deprived of the *minimal* civilized measures of life's necessities—not whether they receive the most effective or humane programs a facility could provide.  *Wilson*, 501 U.S. at 304.  Accordingly, this claim is **DISMISSED** *without prejudice*.

5.    *Code violations*

Plaintiff invokes 18 U.S.C. §§ 241 and 242 and various New Jersey statutes and administrative provisions as additional bases for relief.  These provisions do not support § 1983 liability.  Section 1983 creates a cause of action only for deprivations of rights "secured by the Constitution and laws" of the United States.  *West*, 487 U.S. at 48.  Violations of state statutes, state regulations, or state administrative codes do not independently give rise to a § 1983 claim.  *Baker v. McCollan*, 443 U.S. 137, 146 (1979); *see also Holman v. City of York*, 564 F.3d 225, 229 (3d Cir. 2009).  As for 18 U.S.C. §§ 241 and 242, those are federal criminal statutes that vest enforcement authority exclusively in the United States and create no private right of action.  *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).  Accordingly, Plaintiff's claims predicated solely on state code violations and on 18 U.S.C. §§ 241 and 242 are **DISMISSED** *with prejudice*, because Plaintiff cannot, as a matter of law, bring claims under these provisions.

**B.    Equal Protection**

Although Plaintiff does not explicitly cite the Fourteenth Amendment, the Court construes the Complaint as asserting an equal protection claim based on racial discrimination.  *See Erickson*, 551 U.S. 89 (stating pro se pleadings must be liberally construed).  The Equal Protection Clause of the Fourteenth Amendment requires that similarly situated persons be treated alike.  *City of*

14

*Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Racial classifications are subject to strict scrutiny, and a plaintiff asserting racial discrimination under § 1983 must allege that he was treated differently from similarly situated individuals because of his race, and that the differential treatment was motivated at least in part by discriminatory intent. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *Washington v. Davis*, 426 U.S. 229, 239-42 (1976). Allegations of disparate impact or statistical disparity alone are insufficient to state an equal protection claim.

Plaintiff alleges that approximately sixty percent of the prison population at NSP is Black, that the food served is unhealthy and disproportionately affects Black inmates, and that the totality of the conditions amounts to what he characterizes as racially targeted treatment. Compl. at 20-21. These allegations, while grave in tenor, are generalized and conclusory. Plaintiff does not identify any specific comparators—similarly situated non-Black prisoners who received materially different conditions—or allege facts from which discriminatory intent could plausibly be inferred. As the Supreme Court has emphasized, statistical disparities without accompanying factual allegations of purposeful discrimination do not state a claim. *Arlington Heights*, 429 U.S. at 265; *Washington v. Davis*, 426 U.S. at 239-42.

Accordingly, Plaintiff's equal protection claim is **DISMISSED** ***without prejudice***.[3]

## C.    Unreasonable Search and Seizure Claims

Plaintiff claims that the multiple searches of his cell and subsequent strip searches violated his constitutional rights. Compl. at 15-21. Although the Fourth Amendment prohibits unreasonable searches, an inmate's rights under the Fourth Amendment are limited both by the need to maintain prison security and by the inmate's own reduced expectancy of privacy. *Bell v.*

---

[3] To survive the IFP screening stage, Plaintiff must, at the very minimum, allege particularized facts showing that defendants treated him differently from similarly situated individuals because of his race, or that a facially neutral policy was adopted with discriminatory purpose.

*Wolfish*, 441 U.S. 520, 558-60 (1979); *Lyon v. Farrier*, 727 F.2d 766, 769 (8th Cir. 1984). "The Supreme Court of the United States has stated unequivocally that 'the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell.'" *Kinard v. Bakos*, 566 F. App'x 102, 104 (3d Cir. 2014) (quoting *Hudson*, 468 U.S. at 526). Therefore, Plaintiff's Fourth Amendment claim as it relates to any search of his cell is **DISMISSED *with prejudice*** because amendment of this claim would be futile.

However, an inmate's challenge to a *strip search* may be cognizable under § 1983 through the Fourth or Eighth Amendments. *See Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 621 F.3d 296, 309-11 (3d Cir. 2010); *Jordan v. Cicchi*, 428 F. App'x 195, 199-200 (3d Cir. 2011). Strip searches may be reasonable in the prison context. "Inmate search policies are constitutional if they strike a reasonable balance between inmate privacy and the needs of the institutions." *Parkell v. Danberg*, 833 F.3d 313, 326 (3d Cir. 2016) (citation modified). Thus, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* (citation modified).

To raise a Fourth Amendment claim in this context, an inmate must allege that the strip search was unreasonable. *Payton v. Vaughn*, 798 F. Supp. 258, 261-62 (E.D. Pa. 1992). Because prisons have a legitimate governmental interest in maintaining safety and keeping contraband out of prisons, strip searches performed without particularized suspicion do not violate the Fourth Amendment where officials conduct searches in a reasonable manner to maintain security and to prevent the introduction of contraband or weapons in the facility. *Florence*, 621 F.3d at 309-11. In *Parkell*, the Third Circuit explained that "[r]outine, suspicionless inmate search policies may sweep quite broadly and still be reasonable." 833 F.3d at 329. The Third Circuit held, however, that "thrice-daily bodily searches" of inmates in complete isolation in stripped-down cells was not sufficiently related to legitimate penological purposes, as those inmates would not have the opportunity to possess contraband. *Id.* at 328-29 (finding that the prison's "security interests are

16

not reasonably advanced by a blanket policy of frequently and intrusively searching inmates who have previously been thoroughly searched and held in a stripped-down isolation cell without human contact ever since").

Strip searches may also be analyzed under the Eighth Amendment where they are conducted in a manner that is grossly offensive, serve no legitimate penological interest, or constitute an act of harassment or punishment. The Eighth Amendment prohibits treatment that is "grossly disproportionate to the severity of the offense" and conditions that are "incompatible with the evolving standards of decency that mark the progress of a maturing society." *Rhodes v. Chapman*, 452 U.S. 337, 346–47 (1981). A strip search that is "excessive, vindictive, harassing, or unrelated to any legitimate penological interest" may state an Eighth Amendment claim. *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988); *see also Jordan*, 428 F. App'x at 199-200 (noting an inmate's challenge to a strip search may be cognizable under the Fourth or Eighth Amendments). Where a plaintiff alleges that a search was conducted not for a legitimate security purpose but to harass or punish for protected activity, the Eighth Amendment may provide a distinct basis for relief. *See Farmer*, 511 U.S. at 834 (deliberate indifference to a substantial risk of serious harm violates the Eighth Amendment).

Turning to Plaintiff's specific strip search allegations, the Court finds that the strip searches of Plaintiff by Dawson on July 11 and July 22, 2025, which Plaintiff alleges were conducted without any justification, are not cognizable under the Fourth Amendment as a categorical matter. Strip searches conducted incident to routine security operations or cell transfers do not require individualized suspicion. *Florence*, 621 F.3d at 309–11. The Fourth Amendment inquiry in the prison context turns on whether the search "strikes a reasonable balance between inmate privacy and the needs of the institutions," applying the four-factor *Parkell* test: scope of the intrusion, manner of conduct, justification, and place. 833 F.3d at 326. The mere fact that a search was

17

conducted without articulated justification does not, in the prison context, render it constitutionally unreasonable. *Id.* at 329. Those claims are therefore **DISMISSED** *with prejudice*.

The SOG strip search on November 15, 2025, presents a distinct issue. The gravamen of Plaintiff's claim is not that the strip search itself—conducted facility-wide during a surprise raid— was impermissible, but rather, that the SOG officers recorded the search on body cameras without first informing Plaintiff that the cameras were capturing video, allegedly in violation of N.J. Admin. Code § 10A:3-5.7. Compl. at 15. The undisclosed video recording of a strip search is a distinct and additional intrusion that goes beyond the search itself. Unlike the physical search, which serves a legitimate penological interest in detecting contraband, the surreptitious creation of a permanent video record of an inmate's unclothed body implicates a distinct dimension of bodily privacy that may not be justified by the same security rationale. *See Parkell*, 833 F.3d at 326 (noting that courts must evaluate "scope of the particular intrusion" and "manner in which it is conducted"); *cf. York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963) (photographing person in state of undress without justification implicates constitutional privacy interests); *Graham v. Wright*, No. 22-504, 2022 WL 19774058, at *3 (E.D. Cal. June 29, 2022) (finding plaintiff stated a Fourth Amendment claim where officers recorded a strip search on a body camera, exposing the inmate's genitals on video).

At the IFP screening stage, and liberally construing the Complaint, the Court finds that Plaintiff's allegation that SOG officers recorded the strip search on body cameras—disclosing that fact only after Plaintiff inquired—is enough at this juncture to state a claim that the manner of the search was constitutionally unreasonable. Courts have recognized that, although routine strip searches may be permissible, the *manner* in which they are conducted may render them unconstitutional where they unnecessarily intrude upon bodily privacy. *See Parkell*, 833 F.3d at 326 (courts must assess the "manner in which [the search] is conducted"); *cf. Florence*, 621 F.3d

18

at 309-11 (upholding suspicionless strip searches where reasonably related to institutional security).

Accepting Plaintiff's allegations as true, the creation of a permanent video record of his unclothed body—without prior notice and absent any apparent penological justification—is not obviously justified by the same penological interests that support the search itself and therefore plausibly states a Fourth Amendment violation at this stage. Compl. at 15.

Plaintiff's Fourth Amendment unreasonable search claim against the John Doe SOG Defendants arising from the undisclosed video recording may therefore **PROCEED**. Plaintiff's Fourth Amendment unreasonable search claims based on searches of his cell will be **DISMISSED** *with prejudice*.

### D.    First Amendment Retaliation Claims

The elements of a First Amendment claim based on retaliation for a prisoner engaging in constitutionally protected activity are that: (1) the plaintiff's conduct was constitutionally protected; (2) prison officials subjected the plaintiff to an adverse action; and (3) the plaintiff's constitutionally protected conduct was a substantial or motivating factor in the prison officials' adverse action. *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016). An adverse action is one that causes more than minimal consequences. *Id.* at 423. The substantial or motivating factor element may be shown by "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Id.* at 424 (citation modified). "Where the temporal proximity is not so close as to be unduly suggestive, the appropriate test is timing plus other evidence." *Id.* (citation modified). Prison officials may invoke the "same decision defense" if they establish that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Id.* at 422 (citation modified).

The Court construes the Complaint to raise two First Amendment retaliation claims.

19

*First*, Plaintiff alleges that he filed complaints with NSP's administration in late July 2025 concerning Dawson's intoxicated and retaliatory conduct—including warrantless cell searches, destruction of personal property, and a false disciplinary charge—and that in early August 2025, he separately reported Franklin's pattern of repetitive cell searches (six to eight searches in a single week) to NSP's administration. Compl. at 18–19.

Filing grievances against prison officials is constitutionally protected activity. *Watson*, 834 F.3d at 422. According to the Complaint, adverse actions followed promptly after Plaintiff filed these grievances: on August 6, 2025, when Dawson returned to work, he confronted Plaintiff about having reported Franklin, and then denied Plaintiff recreation. The following day, Plaintiff was transferred from Unit A1W, the honor unit, to Unit F1E, which is allegedly the most dangerous unit in the prison. Plaintiff claims these actions are in retaliation for his complaints about both officers. Compl. at 10, 11, 19.

The temporal proximity between Plaintiff's protected complaints and the adverse actions is unusually suggestive, and the Complaint's allegations support a plausible inference of retaliatory motive as to both Dawson and Franklin. Transfer to a demonstrably more dangerous housing unit and denial of recreation each constitute adverse actions capable of deterring a prisoner of ordinary firmness from engaging in further protected activity. *See Watson*, 834 F.3d at 422-24. Plaintiff's allegations, accepted as true, are sufficient to state a First Amendment retaliation claim against Dawson and Franklin.

*Second*, Plaintiff alleges that after he complained to Sergeant Pitre about Officer Everett's housing decision—specifically, that Officer Everett had assigned him to a cell with LB, a known K-2 and fentanyl user—Officer Everett responded by refusing to submit Plaintiff's outside food order, thereby depriving him of a commissary incentive that would not be available again for six months. Compl. at 4, 12-14.

20

Each element of a First Amendment retaliation claim is satisfied on this claim as well. *First*, Plaintiff's complaint to Sergeant Pitre about Everett's conduct constitutes constitutionally protected activity. Seeking relief from prison officials through the grievance or complaint process is protected, and oral complaints to supervisory staff may suffice. *Watson*, 834 F.3d at 422. *Second*, the denial of the outside food order constitutes an adverse action. An adverse action need only be one that would "deter a person of ordinary firmness from exercising his First Amendment rights." *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). The deprivation of an earned commissary incentive for a period of six months credibly satisfies this standard. *Third*, a causal nexus is plausibly alleged: the Complaint asserts that Officer Everett's denial of the food order followed directly upon learning that Plaintiff had complained about him to his supervisor. The temporal proximity between the protected complaint and the retaliatory deprivation, combined with Officer Everett's direct knowledge of the complaint, supports the requisite inference of retaliatory motive. *Watson*, 834 F.3d at 424. Therefore, this claim may **PROCEED** against Officer Everett.

### E.    Supervisory and *Monell* Claims

Under § 1983, a supervisor cannot be held liable on a theory of *respondeat superior*; there is no vicarious liability for the constitutional torts of subordinates. *Rode*, 845 F.2d at 1207. A supervisor may be liable only if he or she "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). Plaintiff has not named any specific NSP supervisory official as a defendant beyond those already addressed herein. To the extent Plaintiff seeks to assert supervisory liability claims against additional individually named officials in an amended complaint, such claims may proceed **only** if Plaintiff alleges specific facts showing each official's personal knowledge of the constitutional violations and knowing acquiescence therein. Conclusory allegations of supervisory

21

failure, without more, are insufficient. *Iqbal*, 556 U.S. at 678. Therefore, Plaintiff's *Monell* claims brought against any Defendants operating in a supervisory capacity are **DISMISSED** *without prejudice*.

A municipality or county is liable under § 1983 only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. 658, 694. Plaintiff names Essex County and the City of Newark as Defendants, but alleges no facts identifying an official policy or custom of either entity that caused the alleged constitutional violations. Plaintiff's generalized allegations about conditions at NSP—a state facility operated by the NJDOC, not by the County or the City—do not implicate any policy or custom attributable to Essex County or the City of Newark. A municipality cannot be held liable under *Monell* for the unconstitutional acts of a state entity over which it exercises no authority or control. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997) (plaintiff must identify a municipal policy or custom that is the "moving force" behind the constitutional deprivation); *see also Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (reaffirming that municipal liability requires a direct causal link between a municipal policy or custom and the alleged constitutional deprivation). Accordingly, Plaintiff's *Monell* claims against Essex County and the City of Newark are **DISMISSED** *without prejudice*.

## IV.     CONCLUSION

For the foregoing reasons, the Court will **GRANT** Plaintiff's IFP Application and will allow Plaintiff to **PROCEED** with the following claims: (1) Plaintiff's Eighth Amendment conditions-of-confinement claim based on exposure to unsanitary conditions (including rodent and pest infestations), and chronic secondhand smoke or aerosolized fumes from K-2 and fentanyl throughout NSP against the John Doe Administrator Defendants; (2) Plaintiff's Eighth Amendment conditions-of-confinement claim based on his cellmate LB's active K-2 and fentanyl use against Officer Everett and Sergeant Pitre; (3) Plaintiff's Fourth Amendment unreasonable

22

strip search claim arising from the November 15, 2025 SOG raid against the John Doe SOG Defendants; and (4) Plaintiff's First Amendment retaliation claims against Officers Dawson, Franklin, and Everett.   Plaintiff's remaining claims are **DISMISSED** as set forth above.[4]   An appropriate Order follows.

June 1, 2026

Date

_____

Evelyn Padin, U.S.D.J.

---

[4] Plaintiff is reminded that, to proceed on his Eighth Amendment conditions-of-confinement claims against the John Doe Administrator Defendants, he must file an Amended Complaint identifying by name those administrators who had contemporaneous knowledge of the conditions described in the Complaint and failed to take reasonable measures to address them.  To proceed on his Fourth Amendment claims against the John Doe SOG Defendants, Plaintiff must similarly identify by name those officers who participated in the undisclosed video recording of the November 15, 2025 strip search.